## PASQUEL v. OWEN.

No. 14124.

United States Court of Appeals
Eighth Circuit.

Dec. 29, 1950.

Victor B. Harris, St. Louis, Mo. (Smith, Harris & Hanke, St. Louis, Mo., and Mann, Mann, Walter & Powell, Springfield, Mo., were with him on the brief), for appellant.

E. C. Curtis, Springfield, Mo. (Farrington & Curtis, Jack S. Curtis and Richard Farrington, all of Springfield, Mo., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and RIDDICK, Circuit Judges.

GARDNER, Chief Judge.

This was an action brought by appellant against appellee to recover damages for the alleged breach of a contract to play baseball in Mexico. Appellee, a professional baseball player, answered admitting the execution of the contract between himself and the appellant, but denied that he had breached the contract and affirmatively alleged by counter-claim that appellant had broken the contract by discharging him as manager. The parties will be referred to as they were designated in the trial court.

The contract pleaded by both parties was in writing and omitting formal parts reads as follows:

"This Agreement, made and entered into this 2nd day of April, 1946, by and between Jorge Pasquel, President, Mexican Baseball League, an individual, hereinafter referred to as the President, and Arnold (Mickey) Malcolm Owen, an individual hereinafter referred to as Mr. Owen.

### Article I.

"The president herewith agrees that, in return for Mr. Owen's signature under these conditions, Mr. Owen will become player-manager of the Torreon Club of the Mexican Baseball League, in the City of Torreon, Mexico, and Mr. Owen, in return, herewith agrees to perform the services of player-manager as herein described.

### Article II.

"The president herewith pays to Mr. Owen a sum of $12,500 (U. S. currency) as a bonus to sign this agreement, said payment to be paid this date as a condition of signing this agreement.

### Article III.

"The president herewith agrees that Mr. Owen will be paid an annuary salary of $15,000 (U. S. currency), free and unencumbered for him, with all boarding expenses, first class, to be paid for him by the president, in Torreon, for a period of five years from this date.

### Article IV.

"The president also agrees to provide a first class apartment, with living expenses in Torreon for Mr. Owen and his wife, as well as transportation expenses to and from Springfield, Mo., and Torreon, annually for five years.

### Article V.

"The president further agrees that, as of this date, he herewith pays to Mr. Owen one-half of Mr. Owen's first annual salary, to-wit, one-half of $15,000, or $7,500, in U. S. Currency."

On April 12, 1946, at Laredo, Texas, at defendant's request the parties entered into a supplemental contract in writing, which omitting formal parts reads as follows:

"Mr. Owen has received at this city (Laredo, Texas), the sum of $7,500.00 (Seven thousand five hundred dollars). This amount, together with the amount already advanced by Mr. Gillespie at Saint Louis, Mo., makes the completion of his whole salary, for playing baseball, during one season, in the Republic of Mexico.

"Said salary, corresponding to one whole season, has been already received by Mr. Owen, as a guarantee, according with the signed contract.

Mr. Owen will receive his salary in full, for the 1946 baseball season, retaining as a guarantee, the sum that he has received for one baseball season, which sum will apply exclusively in payment of the last baseball season, which Mr. Owen is compelled to play, as per the contract signed at St. Louis, Mo.

"Mr. Bernardo Pasquel, duly authorized by his brother Jorge, executes this contract at Laredo, Texas, together with the following witnesses: Mrs. M. Owen and Danilo Medina.

"Received the sum of $7,500.00 (Seven thousand five hundred dollars), at Laredo, Texas, this 12th day of April, 1946."

Following the execution of this contract defendant, having received $12,500.00 designated as a bonus and $15,000.00 for his fifth year's salary, departed for Mexico but enroute apparently changed his mind and attempted to make a deal with an American baseball club to play in the United States. He testified that had he succeeded he would have returned the money received as a bonus and the $15,000 for the fifth year's salary because in his opinion he had not earned any money. He again changed his mind and proceeded to Mexico where he reported not to the Torreon Club as provided in the contract but by mutual consent of the parties reported to the Vera Cruz Club, which club was owned by plaintiff. Without protest or objection he played with the Vera Cruz Club for five or six weeks simply as a player and was then made manager. About July 5, 1946, after defendant had been

manager for about five weeks he was relieved of his duties as manager of the Vera Cruz Club. He, however, remained as a player with the Vera Cruz team for approximately another month, receiving the compensation provided for in his contract. Late in the afternoon of August 5, 1946, he and his wife suddenly decided to leave Mexico and drove by automobile all the way to the border, a continuous trip of some eighteen hours. Defendant testified that his reason for leaving Mexico was that he had been unable to see the plaintiff after his removal as manager and that this embarrassed him and hurt his pride. When he was relieved of his duties as manager he received a written notice to that effect which he signed. Defendant testified that he had been dissatisfied in Mexico because of the way plaintiff operated his ball club; that plaintiff had frequently gone onto the playing field and argued with the umpire, and occasionally countermanded an order which the defendant had given. He admitted that it was customary for a baseball club owner to take an active interest in the team but he objected to the manner in which plaintiff interferred. He testified that it is the usual practice in baseball to remove a manager summarily and that this practice was well known to him. His salary was $2,146.86 per month which was paid to him by plaintiff up to the time he left Mexico. He gave no notice to plaintiff of his intention to leave. He did not write plaintiff a letter and he did not know whether plaintiff was actually in Mexico at the time of his departure. Plaintiff at no time repudiated the contract or declined to pay defendant's salary. His departure from Mexico and his arrival in the United States became a matter of news and he was interviewed by sports writers. There is some dispute as to what he said but defendant admitted that he told various reporters that he owed plaintiff money; that what he had in mind at that time was the $15,000.00 paid him in advance for the 1950 baseball season; that he did not think he was entitled to that because he had not earned it. Other facts will be developed in the course of this opinion.

Plaintiff requested a number of instructions, all of which were refused. One of these instructions was to the effect that if the jury should find from the evidence that the $12,500.00 which defendant received from plaintiff as a bonus at the time the contract was entered into was so paid with the understanding that the defendant would in good faith carry out the agreement and if they should find that the defendant had not in good faith carried out the agreement the defendant's failure to return the $12,500.00 should be considered as part of plaintiff's damages. Another instruction so refused was to the effect that the defendant was not entitled to recover against plaintiff on his counterclaim for the United States income taxes for the years 1947, 1948, 1949 and 1950, and another was to the effect that defendant was not entitled to recover anything against plaintiff on his counterclaim for salary after his departure from Mexico. Another requested instruction was to the effect that in fixing defendant's damages the jury should consider any monies earned by defendant since he left Mexico and any sums he might reasonably have earned in the exercise of due diligence.

The court in its instructions told the jury as a matter of law that plaintiff had no right to recover the $12,500.00 paid at the time of the execution of the contract as a bonus. The court also in effect instructed the jury that if the plaintiff removed defendant as manager this constituted a breach of the contract entitling defendant to recover damages, the instruction in this regard being as follows:

"Now, you understand, the contract is before you, that he went down there as player-manager—as player-manager—and I may say to you as a matter of law that the plaintiff could not discharge him from either one or the other because his contract was that he was a player-manager; that he had to do both. That was the contract."

This instruction was in effect repeated as follows:

"Now, as I said, the contract provided he go to Old Mexico as manager-player. When he was removed as manager, if he

were removed as manager—if he were removed as manager—then it would be my duty to tell you that was a breach of the contract, if he were removed as manager of the baseball club, because that was a part of the contract. He was to be a player-manager."

Exception was duly saved to the refusal to give the requested instructions and the giving of the above noted instructions. The jury returned a verdict for $51,428.52 in favor of the defendant and judgment was duly entered thereon.

On this appeal the plaintiff contends, among other things, substantially as follows: (1) the instruction that the removal of defendant as either player or manager constituted a breach of the contract amounted to a directed verdict for the defendant and was erroneous; (2) the court erroneously instructed that defendant was entitled to retain the $12,500.00 bonus paid him at the signing of the contract; (3) the admission in evidence of Exhibit 6-A, a letter from plaintiff to defendant, antedating the contract, was prejudicial error; (4) the court's instructions permitting defendant to recover damages beyond the date of the trial was erroneous.

■ Did the relieving of defendant of his duties as manager as a matter of law constitute a breach of the contract, warranting defendant in abandoning it? Plaintiff at no time repudiated the contract but on the contrary continued to pay defendant his compensation as provided therein. The contract uses the term "player-manager." It does not, however, indicate whether defendant was to function as manager at all times, nor whether he was to function as player at all times, or whether the employer might designate when he should act as manager or when he might act as player, or whether he should act in both capacities simultaneously; in fact, the supplemental and amendatory contract does not refer to the defendant as player-manager but recites that the payment therein referred to "makes the completion of his (defendant's) whole salary for *playing baseball* during one season." The contract was susceptible of the construction that it was optional with the employer to designate from time to time in what capacity the defendant should act, whether as player or manager. The employer, who was the owner of the ball club in which defendant was to play, did not surrender to defendant his entire control or supervision of the club merely by employing the defendant and it appears that the parties to the contract did not construe it as being mandatory upon plaintiff to use the defendant at all times in a managerial capacity. As a matter of fact, he commenced playing ball for the plaintiff as a catcher and continued in that capacity for five or six weeks before he was asked to act as manager. During this time the manager for the team was said to be a personal friend of plaintiff but that plaintiff was going to release him. However, defendant made no complaint but continued as a player. He was then used as manager for about five weeks and was relieved from those duties by request of the plaintiff, following which he again continued playing ball in the capacity of catcher.

■ Bearing upon the question of the practical construction of this contract it is noted that defendant testified: "The man who was removed as manager in order to make me manager continued as a player with the Vera Cruz team." In determining the meaning of an indefinite or ambiguous provision in a contract, the interpretation placed upon it by the parties prior to the time it became a matter of controversy is entitled to great, if not controlling, influence in ascertaining the intent and understanding of the parties and courts will generally follow such practical interpretation. Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410; Pitcairn v. American Refrigerator Transit Co., 8 Cir., 101 F.2d 929; Thomson v. Thomson, 8 Cir., 156 F.2d 581; Floyd v. Ring Construction Corp., 8 Cir., 165 F.2d 125; Craig v. Thompson, 8 Cir., 177 F.2d 457. In Pitcairn v. American Refrigerator Transit Co., supra, we among other things said:

"Where there is obscurity or ambiguity, however, the language used should be read in the light of all the surrounding facts and circumstances, including the acts of the

parties indicating what interpretation was placed upon it by the parties themselves. Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties." [101 F.2d 937.]

The strict construction placed upon this contract by the instruction complained of would have prevented Owen as manager from temporarily relieving Owen as player, even though Owen as player had "gone into a slump" and the best interests of the club and its owner would be served by temporarily benching Owen the player. Such an act, we think, would not have justified plaintiff in repudiating his contract and suing for damages. Neither do we think it can be said as a matter of law that relieving defendant of part of his duties; to-wit, managerial duties, warranted defendant in abandoning the contract.

▇ Defendant was notified of the change in his position by written communication. He says he thereafter attempted to see the plaintiff, but he did not write him as he could readily have done and he gave plaintiff no notice of his intention to abandon the contract. Had plaintiff received such notice he might then have restored defendant as manager because he had not indicated any intention to repudiate or terminate the contract. A breach of the contract by one party may, of course, be of such character as to warrant the other party in abandoning it, but to permit an abandonment the failure of performance by the other party must go to the substance of the contract and where there is no distinct refusal by the party in default to be bound by the contract in the future, his conduct must be such clearly to indicate that he does not intend to be bound by its terms. A breach committed by one of the parties may be a breach which the parties have not on a reasonable construction of the contract regarded as vital to its existence, in which event the breach does not discharge the other party or warrant his abandoning it.

The contract here is specific in the matter of compensation. As has already been observed, it is not specific as to the obliga-tions of the parties with reference to the defendant's duties. The parties apparently by their subsequent action indicated that the mere designation of the defendant as player-manager was not a vital provision. So far as plaintiff was concerned there was at most only a partial breach of the contract as he at no time failed to pay the full consideration agreed upon, and following the alleged breach defendant made no demand of performance upon him but so far as plaintiff knew defendant accepted plaintiff's performance of the contract. As said by the late Walter H. Sanborn, speaking for this court in Kauffman v. Raeder, 8 Cir., 108 F. 171, at page 177, 54 L.R.A. 247, "Now the plaintiff has performed the substantial parts of his covenants, and the defendants have accepted and retained the substantial benefits which they sought to secure by the performance of his covenants, while they have refused to perform any portion of their own. The plaintiff has released his property, his lessee, and its assignee, the Century Company, from liability for the $35,000 rent, has furnished the use of his property to the defendants' corporation for a year without the payment of any rent, has accepted and held the preferred stock from 1896 until the present time, and has offered and still offers to assign and deliver it to the defendants, as he agreed to do. The defendants have accepted, enjoyed, and still retain the use of the leased premises by their corporation during that year without the payment of rent, and the release of the property, of the lessee, and of its assignee from liability for this $35,000. They have received and retain the great desiderata which induced them to make their promise, and yet they refuse to pay a dollar for these benefits and insist that they are absolved from all liability because the plaintiff did not offer to assign and deliver the stock to them in accordance with every legal technicality on the very day when their obligation matured, although he was always ready and willing, and within four months thereafter he offered to do so in compliance with every requirement of the law which the defendants did not waive. Can a party to a contract retain all the benefits of a sub-

stantial performance of it by the other party, and then escape all its burdens and repudiate all his obligations by means of such a technicality as this? There are two principles of law which forbid such a manifest injustice and compel a negative answer to this question."

In Pickens County v. National Surety Co., 4 Cir., 13 F.2d 758, 761, the court considered the question of the right of one party to abandon his contract for alleged breach by the other party. In the course of the opinion by Judge Parker it is among other things said:

"When he quit work, he had received, according to the evidence of plaintiff, approximately $1,000 more than he was entitled to demand at that time, even including the $3,800 balance on back work. The withholding of the $3,800, under the circumstances, even if due and payable, would not be a breach going to the substance or root of the contract, which would justify rescission or abandonment by the contractor, in view of the payment to and receipt by him of the sums mentioned, which amount in the aggregate to $16,560.39.

" 'To permit abandonment, it is necessary that the failure of performance go to the substance of the contract.' 13 C.J. 657.

" 'Before partial failure of performance of one party will excuse the other from performing his contract, or give him a right of rescission, the act failed to be performed must go to the root of the contract.' 6 R.C.L. 1014; Chamberlin v. Booth & McLeroy, 135 Ga. 719, 70 S.E. 569, 35 L.R.A., N.S., 1223. * * *"

Ordinarily strict compliance with every specification of a contract is not of its essence unless made so by the terms of the contract itself or by necessary implication, and where one party has received and retained the benefit of substantial partial payments by the other party, he can not retain the benefits and repudiate the contract, but in order to effect a discharge and warrant an abandonment the partial failure to perform must go to the very root of the contract. Tichnor Bros. v. Evans, 92 Vt. 278, 102 A. 1031, L.R.A.1918C, 1025. It is well established that not every breach of a contract will authorize the other party to abandon it and refuse further performance. It can not here be said as a matter of law that the plaintiff breached a vital part of this contract. The acts of the parties forbid such a conclusion and the alleged breach could result in no financial loss to the defendant.

But there is still a further reason why we think it could not be said as a matter of law that the defendant upon being relieved of his duties as manager had the right to abandon his contract. The evidence is without dispute not only that defendant had under this contract acted as manager only for a period of some five or six weeks but it is equally without dispute that after he was relieved from his duties as manager he continued to perform his duties as a player and to receive his compensation as such for a period of four or five weeks. He did not communicate with the plaintiff as he might have done. He registered no complaint so far as the plaintiff knew and he gave no intimation to plaintiff that he was dissatisfied or intended to abandon the contract because of its alleged breach. Certainly strict and full performance of a contract may be waived by either of the parties and where one party entitled to strict performance waives such performance there can be no right to damages for the failure to perform strictly; neither can there be a right in the party so waiving strict performance to abandon the contract. It is said that any act indicating an intention to continue under the contract will operate as a conclusive election. Bu-Vi-Bar Petroleum Corp. v. Krow, 10 Cir., 40 F.2d 488, 69 A.L.R. 1295; Williston on Contracts, Secs. 688 and 1334. Here, after the alleged breach defendant not only continued under the contract but plaintiff paid the compensation due under the contract. This action showed that the contract was deemed to be a subsisting agreement after the alleged default. Nathan Elson & Co. v. H. Beselin & Son, 116 Neb. 729, 218 N.W. 753; 12 Am.Juris., title Contracts, Sec. 390. In Williston on Contracts, Sec. 688, it is said:

"The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense therefore is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to."

The undisputed evidence here, in our view, showed as a matter of law that the defendant waived the alleged breach of the contract by the plaintiff and hence he had no right to abandon it.

█ It is urged, however, that plaintiff is not entitled to invoke the doctrine of waiver because it was not pleaded in his complaint. Rule 15(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides that,

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

See, also: Lientz v. Wheeler, 8 Cir., 113 F.2d 767; DeLoach v. Crowley's Inc., 5 Cir., 128 F.2d 378. The evidence going to this issue was produced by defendant and was received without objection.

█ Defendant relies strongly on Cooper v. Stronge & Warner Co., 111 Minn. 177, 126 N.W. 541, 27 L.R.A., N.S., 1011; Kramer v. Wolf Cigar Stores Co., 99 Tex. 597, 91 S.W. 775, and Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139. The cases are readily distinguishable in their facts. In each of these cases the complaining party was hired as a manager only. When he was relieved as manager he was assigned other and different duties. The vice in the act complained of was not in relieving him of certain duties but in imposing other duties upon him. In the instant case no additional duties or responsibilities were imposed upon defendant but he was simply relieved from certain duties and responsibilities which the plaintiff might have exacted of him. He was not deprived of his employment by any act of plaintiff, nor did he suffer any pecuniary loss by any act of the plaintiff, and as said

in Block v. City of West Palm Beach, 5 Cir., 112 F.2d 949, at page 952:

"It is elementary that the mere breach of an agreement which causes no loss to plaintiff will not sustain a suit by him for damages, much less rescission."

█ The court instructed the jury that the $12,500.00 paid to defendant at the time of signing the contract, designated as a bonus, had been earned by him by the mere act of signing the contract and that even though the contract had immediately been rescinded defendant would have been entitled to retain this money. It may be observed in passing that this was not defendant's view of the effective agreement, as indicated by his testimony. He thought that he had not earned this money. This $12,500.00 was not paid to him as a gift but however designated it was a part of the consideration for the contract. Adams v. Mid-West Chevrolet Corp., 198 Okl. 461, 179 P.2d 147, 175 A.L.R. 554; Joint Consolidated School Dist. No. 2 v. Johnson, 163 Kan. 202, 181 P.2d 504; Lakos v. Saliaris, 4 Cir., 116 F.2d 440; Willkie v. Commissioner of Internal Revenue, 6 Cir., 127 F.2d 953; State v. Christopher, 318 Mo. 225, 2 S.W.2d 621. In Willkie v. Commissioner of Internal Revenue, supra, the court among other things said:

"Giving this phrase its ordinary signification, the payment falls within the definition of bonus, which is a boon over and above what is normally due as remuneration to the receiver, money or its equivalent, given as a premium or as an extra or irregular remuneration in consideration of offices performed or to encourage their performance." (Italics supplied.) [127 F.2d 956.]

The giving of this instruction was, we think, prejudicial error.

Over plaintiff's objection a letter written by plaintiff to defendant, dated March 19, 1946, was admitted in evidence and read to the jury. It was a part of the preliminary negotiations between the parties and apparently was received in evidence on the theory that it showed the inducement for the defendant to go to Mexico. The letter,

which is quite a lengthy one, among other things recites that,

"I can not give you any guarantee as you ask me because I do not have any reason to do it. I only have more money than any of the American Leagues together. * * * You ask me to make a deposit in a bank as guarantee. I have more than $30,000,000.00 (U. S. dollars) capital. You, how much do you have? What guarantee do you give me of fulfillment? * * *

"You probably have seen the campaign of slander and insults that the newspapers, paid by the owners of the American teams, have let loose against the Mex. League. This has no importance for us and they do it because they see in me a terrible enemy for the future which is going to destroy for them very soon their monopoly. They have dealt or trafficked with ball players for forty years and it is coming to an end soon. * * *"

We think the letter had no bearing on any issues before the court. It did not tend to clarify the contract of the parties and as it was written and received before the execution of the contract it was superseded by the contract. We think it was prejudicial even though the court in its instructions admonished the jury not to consider the plaintiff's financial condition. London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325; Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 65 F.2d 297; Braatelien v. United States, 8 Cir., 147 F.2d 888; O'Hara v. Lamb Construction Co., Mo.App., 197 S.W. 163; Pevely Dairy Co. v. United States, 8 Cir., 178 F.2d 363; Cohen v. New England Mut. Life Ins. Co., 7 Cir., 140 F.2d 1.

It is noted that the letter not only referred to plaintiff's financial condition but referred in a very derogatory manner to certain alleged conduct of the American baseball leagues. Coming from a foreigner such declarations would tend to arouse the prejudice of American jurors. The attitude of the ordinary American Citizen with reference to professional baseball is reflected in the court's comment during the course of its instructions as follows:

"As I understand he (a witness for defendant) played for the New York Giants, I believe that is what he said, a very reputable and very wonderful team as was the Brooklyn Dodgers team, in which I might pause to say that all Americans take the greatest pride. We take pride not only in the home teams but in the American teams."

The court's instructions permitted defendant to recover damages beyond the date of trial and up to April 2, 1951. Defendant in fact abandoned this contract August 5, 1946, yet under the instructions of the court he was permitted to and did recover what he would have earned under this contract up to April 2, 1951. It is said that this rule of damages is permissible under the law of Missouri. Be that as it may, a matter on which we express no opinion, it is to be recalled that this contract was modified by a supplemental contract drawn not in Missouri but in Laredo, Texas. At that time and pursuant to the amendment of the contract, plaintiff advanced money to the defendant. We think the contract was completed in the State of Texas. The Supreme Court of Missouri, in Illinois Fuel Co. v. Mobile & O. R. Co., 319 Mo. 899, 8 S.W.2d 834, 838, quoting Sec. 333, Am.L.Inst.Restatement, Conflict of Laws (Tent.) said:

" 'A contract is made in the state where the last act toward the completion of the contract is done by a party to the contract, or by an agent who makes a contract for a principal.' "

It must always be borne in mind that the plaintiff at no time repudiated this contract and under such circumstances defendant was not entitled to recover damages beyond the date of trial. Darst v. Mathieson Alkali Works, C.C., 81 F. 284; Schroeder v. California Yukon Trading Co., D.C.Cal., 95 F. 296; Seaman Stores Co. v. Porter, 180 Ark. 860, 23 S.W.2d 249.

In accordance with the court's instruction as to the measure of damages, the jury returned a verdict in favor of the defendant for $51,428.56, which exactly corresponds with the claim of defendant as reflected by his testimony as follows:

"I contend I have $6,428.56 coming for the 1946 season, $15,000 for 1947, $15,000 for 1948 and another $15,000 for 1949 * * *. That is a total of $51,428.56."

In addition to these amounts awarded defendant by the jury's verdict, he had received $8,571.44 as compensation for the year 1946 up to the time of his abandonment of his contract, and he had also received $12,500.00 designated as bonus and $15,000.00 as an advance payment "to apply exclusively in payment of the last baseball season," which would be the season of 1950. If defendant recovers the amount of this judgment he will have received the sum of $87,490.00 as compensation for his services for less than four months of the five year contract period. This result, we think, should not receive judicial sanction.

As well known facts of common knowledge, we may take notice that defendant with other Major League players was reinstated in organized baseball and played with the Chicago Cubs of the National League during a considerable part of the 1949 season and all of the 1950 season. These notorious facts are well known because of their widespread dissemination through daily newspapers and radio broadcasting and we think we may also assume that defendant received compensation for the services rendered as a member of the Chicago Cubs baseball team so that he will have received in addition to the $87,490.00 the salary received by him for his services in 1949 and 1950. Damages generally must be limited to compensation unless punitive damages are allowable and it was defendant's duty to exercise reasonable diligence to minimize the damages and in no event should a party to a contract be permitted to profit by its breach. 15 Am.Juris., title Damages, Sec. 13. In this connection we refer to the Texas case of Kramer v. Wolf Cigar Stores Co., supra, cited by defendant, wherein it is said:

"If it is true, as he claims, that he could not thus have secured such a position, and he knew that fact from the time of his discharge, then, under the second rule laid down in the case referred to, it became his duty to use reasonable diligence to secure other employment for which he was fitted, and, in that case, the amount he should have earned in this way during the term of service should be the deduction." [99 Tex. 597, 91 S.W. 777.]

In the instant case defendant was well known as a skilled ball player. So far as appears from this record he had no experience as a manager and hence had acquired no reputation as such. He therefore secured employment as a ball player. It should also be observed that it appears from the undisputed evidence that defendant could have continued as a ball player in Mexico at the same salary he was receiving and had he done so he would have suffered no financial loss. It was his duty to minimize the damages and this he could have done by continuing as a ball player under his contract.

We pretermit consideration of other contentions urged by the plaintiff. The judgment appealed from is reversed and the cause remanded with directions to grant a new trial and for further proceedings not inconsistent with this opinion.